[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-10771

_____

PALM BEACH COUNTY,
CITY OF ATLANTIS, FLORIDA,

Petitioners,

*versus*

FEDERAL AVIATION ADMINISTRATOR,

Respondent,

CAPTAIN ERROL FORMAN,

Intervenor.

———————————————

Petition for Review of a Decision of the
Federal Aviation Administration
Agency No. 16-17-13

———————————————

Before JILL PRYOR, BRANCH, and ED CARNES, Circuit Judges.

ED CARNES, Circuit Judge:

Lantana Airport is a small regional airport in Palm Beach County, Florida. Captain Errol Forman is a former commercial pilot who now flies a small Cessna jet for his own personal use. Twice in May 2016, Forman landed his Cessna at the Lantana Airport. It might have been a match made in the heavens, if not for a county ordinance.

That ordinance on its face prohibits "pure turbo-jet aircraft" and cargo-carrying aircraft that weigh more than 12,500 pounds from using Lantana Airport, and Palm Beach County enforces the ordinance in a way that actually bans all jets, not just the "pure turbo" variety. So when Forman landed his turbofan Cessna jet at Lantana Airport, the County threatened him with fines and jail time. That bit of unexpected rough air triggered even more turbulence.

Forman complained to the Federal Aviation Administration that the ordinance's jet restriction violated a grant assurance the County had made to the FAA in exchange for federal airport

improvement money. The FAA agreed with Forman and ordered the County to rescind the restriction. The County and the City of Atlantis, which borders Lantana Airport, have petitioned us for review of the FAA's final agency decision.[1] Forman intervened.

## I. The Statutory and Regulatory Background

The FAA gives grants to airport sponsors so that they can build and improve airports to "maintain a safe and efficient nationwide" airport system. 49 U.S.C. §§ 47104(a), 47105(a); see also id. § 47102(26) (defining "sponsor" as "a public agency" or "a private owner of a public-use airport that submits . . . under this subchapter an application for financial assistance for the airport"). In exchange for the grants, sponsors must agree to various written "assurances," including to make the airport "available for public use on reasonable conditions and without unjust discrimination." Id. § 47107(a)(1); see also Airport Improvement Program (AIP) Grant Assurances, 79 Fed. Reg. 18,755, 18,755 (Apr. 3, 2014) (noting that a "complete list of the current grant assurances can be viewed" at https://www.faa.gov/airports/aip/grant_assurances). This case concerns two grant assurances.

The first and most important one is Grant Assurance 22, which is titled "Economic Nondiscrimination." Fed. Aviation Admin., *Airport Sponsor Assurances* 10–11 (2014),

---

[1] Atlantis joined the County's petition because "its residents may be subject to aircraft noise and safety impacts" if the restriction is rescinded. We refer to the County and Atlantis collectively as "the County."

https://www.faa.gov/sites/faa.gov/files/airports/aip/grant_assurances/airport-sponsor-assurances-aip.pdf.    Subsection (a) of Grant Assurance 22 requires sponsors to "make the airport available as an airport for public use on reasonable terms and without unjust discrimination to all types, kinds and classes of aeronautical activities." *See id.* at 10.  Later subsections of Grant Assurance 22 give sponsors some authority to impose conditions or restrictions on airport use.  For example, subsection (h) allows sponsors to "establish such reasonable, and not unjustly discriminatory, conditions to be met by all users of the airport as may be necessary for the safe and efficient operation of the airport," while subsection (i) allows sponsors to "prohibit or limit any given type, kind or class of aeronautical use of the airport if such action is necessary for the safe operation of the airport or necessary to serve the civil aviation needs of the public." *Id.* at 11.

The other assurance that is important here is Grant Assurance 1(a), which is titled "General Federal Requirements."  Grant Assurance 1(a) requires sponsors to "comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance and use of Federal funds for [a] project including but not limited to . . . Title 49, U.S.C., subtitle VII, as amended." *Id.* at 2.  Subtitle VII includes the Airport Noise and Capacity Act (ANCA).  *See* 49 U.S.C. §§ 47521–34.

ANCA generally prohibits "airport noise and access restrictions on the operation of stage 2 and stage 3 aircraft" unless

those restrictions meet stringent statutory requirements.[2]  *See id.*
§ 47524.  ANCA also mandates that restrictions on Stage 3 aircraft,
which is what Forman's Cessna jet is, be "reasonable, nonarbi-
trary, and nondiscriminatory."  *Id.* § 47524(c)(2)(A).  But ANCA
doesn't apply to restrictions that were already in effect by October
or November 1990.  *See id.* § 47524(c)(1) (making ANCA applica-
ble to "airport noise or access restriction[s] on the operation of
stage 3 aircraft not in effect on October 1, 1990"); *id.* § 47524(d)
(requiring a small subset of airport noise or access restrictions to
be "in effect on November 5, 1990" instead).  Those restrictions
are considered "grandfather[ed]."  Fed. Aviation Admin., *Airport
Compliance Manual*, FAA Order 5190.6B § 13.14(b) (2021),
https://www.faa.gov/documentLibrary/media/Order/Order-
5190-6B-Change1.pdf.

The FAA implements ANCA through 14 C.F.R. Part 161,
which sets out the process for analyzing and approving new noise
restrictions, *see* 14 C.F.R. §§ 161.101 to .417, and the penalties for
failure to comply with ANCA, *see id.* §§ 161.501 to .505.  By con-
trast, the FAA enforces compliance with grant assurances using

---

[2] Stage 2 and Stage 3 are noise level categories.  *See* 14 C.F.R. § 36.1(f).  Stage
3 jets, which are the second-quietest category, are "relatively quiet[]."  *See
Friends of E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133,
138 (2d Cir. 2016) (quotation marks omitted); Stage 4 Aircraft Noise Stand-
ards, 70 Fed. Reg. 38,742, 38,742–43 (July 5, 2005) (creating a new Stage 4
category that in 2006 replaced Stage 3 as the quietest U.S.-certified jet cate-
gory).

two other regulatory mechanisms: an informal "Part 13" complaint process, *see* 14 C.F.R. § 13.2; *Airport Compliance Manual* § 5.1, and a formal "Part 16" complaint process, *see* 14 C.F.R. § 16.23; *Airport Compliance Manual* § 5.1.

A person can report a Part 13 complaint by phone, letter, or email, *see Airport Compliance Manual* § 5.6(a), and the complainant doesn't have to be affected by the violation, *see id.* § 5.2. Part 13 complaints are typically handled by the FAA Airports District Office and its Regional Airports Divisions. *Id.* § 5.1. Those offices might choose to investigate the allegations, choose to consult with other FAA offices (like the Flight Standards or the Air Traffic ones) to get airspace or safety studies, or choose to request more information from the complainant or the airport sponsor. *See id.* § 5.8. Those offices might also make a preliminary determination on compliance, identify apparent violations, specify corrective actions, and prescribe deadlines for those actions. *Id.* §§ 5.11 to .13. But any preliminary determination under Part 13 is not a formal or final FAA determination, *see id.* § 5.11, and if the complainant or the sponsor is dissatisfied, they may file a formal Part 16 complaint, *see id.* § 5.12.

Part 16 complaints initiate "the formal administrative process by which the FAA" makes "a formal agency finding" about an airport sponsor's "compliance with its federal obligations." *Id.* § 5.16. A Part 16 complaint, unlike a Part 13 one, must be "directly and substantially affected" by the noncompliance and must give a "concise but complete statement of the facts relied upon to

substantiate each allegation," with supporting documentation. 14 C.F.R. § 16.23(a)–(b). The airport sponsor gets to answer the complaint, every other party gets to file a reply, and all filings must contain supporting documents. *Id.* §16.23(d)–(i). The complainant has the burden to "show noncompliance," but the party who files a motion or asserts an affirmative defense has the burden of proof for those. *Id.* § 16.23(k).

When deciding a Part 16 complaint, "the FAA may rely entirely on the complaint and the responsive pleadings," or it may conduct additional investigation if it finds there's "a reasonable basis" for doing so. *Id.* § 16.29. Once the FAA has finished any investigation it decides in its "sole discretion" to conduct, *see id.*, the Director of the FAA Office of Airport Compliance and Management Analysis makes an initial determination, *id.* §§ 16.3, 16.31. That "Director's Determination" must contain fact findings, legal conclusions, and explanations, and it must be "supported by a preponderance of the reliable, probative, and substantial evidence contained in the record." *See id.* § 16.31(b).

The Director's Determination isn't a final decision subject to formal judicial review. *Id.* §16.247(b)(2). But it can be appealed to the FAA Associate Administrator for Airports. *Id.* §§ 16.3, 16.31(c), 16.33. If that happens, the parties may each file a brief, *see id.* § 16.33(c)–(d), and the Associate Administrator "consider[s] the issues" by analyzing whether: (1) "the findings of fact" are "supported by a preponderance of reliable, probative, and substantial evidence contained in the record"; (2) the "conclusions" are

"made in accordance with law, precedent and policy"; (3) "the questions on appeal" are "substantial"; and (4) "any prejudicial errors occurred," *id.* § 16.33(e). The Associate Administrator then "issue[s] a final decision and order," which are subject to judicial review. *Id.* §§ 16.33(g), 16.247(a); *see also* 49 U.S.C. § 46110(a) (noting that anyone with "a substantial interest" in an FAA order may file "a petition for review" in the "court of appeals . . . for the circuit in which the person resides or has its principal place of business").

## II. The Lantana Airport & its Jet Restriction

Lantana Airport is a regional general aviation airport located south of West Palm Beach. The County runs it as part of a four-airport system. The airport has three relatively short runways and no tower. It acts as a "reliever" for Palm Beach International Airport, which means it is intended to divert slower-moving general aviation traffic (not scheduled passenger service) from that larger, busier airport. Between 1982 and 2021 Lantana Airport received more than $6 million in federal airport development assistance through the § 47104(a) grant program, so it's obligated to follow the grant assurances.

As we have mentioned, the County enforces a restriction that prohibits all jets from using Lantana Airport. And as we have also mentioned, ANCA doesn't apply to restrictions that were in effect before late 1990. *See* 49 U.S.C. § 47524(c), (d); *Airport Compliance Manual* § 13.14(b). So it matters when Lantana Airport's

21-10771                Opinion of the Court                9

jet restriction took effect.  For that reason, we set out in detail the restriction's trajectory and flight path.

The jet restriction began in June 1973, when the Board of County Commissioners passed a regulation providing that: "All jet aircraft in addition to all aircraft weighing in excess of 12,500 pounds engaged in aircraft cargo operations, shall be prohibited from parking, landing, or taking off from the Lantana Airport." The regulation was intended to "limit planes with excess noise from utilizing the airport."  Because "written confirmation of verbal approval" from the FAA "had not been yet received," the Board set a July 1, 1973 effective date for the regulation to "allow sufficient time for this written response."  Before the regulation became effective, the FAA's Miami Airports District Office told the County in writing that the FAA had "no objections to the proposed operational regulation," though the Office did not explain why it had none.  In November 1973, the Board revised the regulation to read: "All jet aircraft prohibited and all aircraft weighing in excess of 12,500 pounds engaged in aircraft cargo operations prohibited."

In 1988 the Board adopted an ordinance "promulgating airport regulations," which it housed in Appendix B of the County's Code of Laws and Ordinances.  The ordinance explicitly "supercedes (sic) and repeals all airport regulations adopted on or before October 27, 1987."  The ordinance did not contain a Lantana

Airport jet restriction like the one in the 1973 regulation.[3]  The ordinance did contain, in a section called "Aircraft operation rules," a provision authorizing the County airport director to "restrict any flight or other operations at the airport . . . for any justifiable reason."  The stated purpose of the ordinance was to "provide for the safety of life and property on airports," to protect "public and private property within airport boundaries," and to "promote the general welfare."

In 1991 the County entered an "interlocal governmental agreement" with the City of Atlantis, which borders the airport. Under a heading called "Lantana Airport Use Restrictions," the agreement provided: "Restricted aircraft will be: pure turbo jet aircraft and aircraft in excess of 12,500 pounds engaging in air cargo operations."  The agreement "recognized that the restrictions . . . are simply guidelines" but noted that if they "cannot be enforced by the County due to FAA regulations, the County . . . agrees to take reasonable steps to attempt to make [them] mandatory."  The preamble of the agreement explained that the County had determined it was in "the best interests of the public health, safety and welfare" — including for "residents living near the Airport" like the people in Atlantis — to have set procedures at the Lantana

---

[3] In fact, the only two times the Lantana Airport is mentioned in the 1988 ordinance are in the definition of "airport" and in an article devoted to noise abatement.  The noise provision in the 1988 ordinance provided: "Preferential runway Palm Beach County Park, Lantana, is Runway #15-33, conditions permitting at pilot's discretion."

Airport and a master plan for its "future growth and safety." It noted that the County had developed "certain procedures" after study and public comment and with the input of a citizens' group.

In 1992 the County's Director of Airports invoked his authority under the 1988 ordinance's aircraft operation rules to issue this directive: "Jet aircraft, of any type and weight classification are prohibited from operating (departing and arriving) at Palm Beach County Park Airport – Lantana." According to the County's brief to us, the directive was prompted by a jet landing at the Lantana Airport.

In 1998 the Board passed a resolution "adopting airport rules and regulations." The resolution noted that "certain rules and regulations exist which govern . . . airports located in Palm Beach County" and that the Board had "determined that it is necessary to repeal the existing rules and regulations and adopt" others. The resolution explicitly provided:

> The Rules and Regulations, as adopted by prior Resolutions and codified in the Code of Laws and Ordinances relating to Palm Beach County Government at Appendix B, as may be amended, and all other Resolutions, or parts thereof in conflict with the provisions of this Resolution, are hereby repealed to the extent of such conflict. This Resolution supersedes and repeals all Airport Rules and Regulations adopted before [February 24, 1998].

The codified 1998 Rules and Regulations, which were attached to the resolution, reiterated that "[a]ll Rules and Regulations previously enacted and any other ordinance or resolution in conflict with the Rules and Regulations are hereby repealed to the extent of the conflict." The 1998 Rules and Regulations also included, within an article devoted to noise abatement, four sections specific to Lantana Airport. Of those four sections, two are relevant here. One provided that "noise abatement and control procedures at the Lantana Airport shall be governed by" the County's 1991 Agreement with Atlantis. The other, called "Use Restrictions," provided:

> The following use restrictions for the Lantana Airport shall be enforced in accordance with the Lantana Interlocal Agreement:
>
> (a) Pure turbo-jet aircraft and aircraft in excess of 12,500 pounds engaging in air cargo operations are prohibited.
>
> (b) All regularly scheduled commercial air carrier passenger flights are prohibited.

The 1998 Rules and Regulations, including the Lantana Airport jet restriction, are still in effect today. *See* Palm Beach Cnty., Fla., Code of Laws & Ordinances app. B §§ 12-4 to 12-7 (2022).

### III. Captain Forman & his FAA Proceedings

Captain Forman is a former commercial pilot who flew Boeing 727 jets for 25 years. He now flies a Cessna Citation twin-engine, turbofan (Stage 3) jet that weighs less than 12,500 pounds,

and it is not used for cargo operations. In May 2016, he twice landed his Cessna at the Lantana Airport and was threatened by the County's Director of Airports with fines and jail time.

### A. Part 13 Proceedings

The month before that happened, in April 2016, Forman had emailed the FAA's Orlando Airports District Office about the jet restriction at Lantana Airport. That District Office contacted the FAA's Southern Region Airports Division for assistance. After the Airports Division gave Forman information about the informal Part 13 complaint process, Forman emailed a complaint to the Airports Division alleging that Lantana Airport's jet restriction violated Grant Assurance 22.

In response to Forman's Part 13 complaint, the County asserted that Lantana Airport's jet restriction was grandfathered under ANCA, that the FAA had not objected to the jet restriction in the (at that time) 43 years it had been in place, and that "many stakeholders" had "justifiably relied" on the FAA's "prior determinations" that the jet restriction was "enforceable."

The County argued that the 1998 resolution didn't alter the effect of the 1973 regulation and that "the difference in language between the 1973 restriction and the 1998 resolution" — specifically the change from "all jet aircraft" to only "pure turbo-jet aircraft" — was "inadvertent" and "reflected misunderstanding" by the Board. To support its argument that "any change in language was unintentional," the County stated that it had "continued to

enforce the restriction exactly as originally enacted in 1973," as a "ban on *all* jet aircraft."

The County also argued that the 1988 ordinance didn't repeal the 1973 regulation, both because the 1988 ordinance wasn't adopted by resolution as required by Fla. Stat. § 332.08(2) and because it wasn't "intended to substantively alter any of the Lantana-specific restrictions." And the County asserted that it complied with Grant Assurance 22 because subsection (i) of that assurance allows airport proprietors to enact restrictions, including about noise, if they are reasonable and necessary for the safe and efficient operation of the airport, which the jet restriction is because pure turbojets are "generally noisier" than turbofan jets.

Forman replied that the County bore the burden of justifying its noise-based restriction by satisfying the FAA's three-part test, which requires that "a regulation restricting airport use for noise purposes: (1) be justified by an existing noncompatible land use problem; (2) be effective in addressing the identified problem without restricting operations more than necessary; and (3) reflect a balanced approach to addressing the identified problem that fairly considers both local and federal interests." *Airport Compliance Manual* § 13.8b; *see also Aircraft Owners & Pilots Assoc. v. City of Pompano Beach*, FAA Docket No. 16-04-01, Director's Determination (Dec. 15, 2005), 2005 WL 3722717, at *28. Forman argued the County had failed to satisfy that test and could not satisfy it on the current record because it hadn't conducted the required safety analysis and airspace study. Citing *Aircraft Owners*,

he argued that compliance with or exemption from ANCA doesn't relieve an airport sponsor of the duty to comply with grant assurances.

The Airports Division mostly agreed with Forman. In December 2016 it issued a preliminary Part 13 report concluding that Lantana Airport's jet restriction "may be unjustly discriminatory," was "not consistent" with Grant Assurance 22(a), and wasn't grandfathered under ANCA. The report pointed out that there was no "documented explanation as to why previous FAA reviewers believed th[e] discriminatory restriction was just or reasonable."[4] It explained that, even though the FAA had "[h]istorically" considered the restriction to be grandfathered by ANCA, the County's documents showed the 1973 regulation was repealed by the 1988 ordinance and not reenacted until the 1991 interlocal agreement at the earliest, which was after ANCA's 1990 grandfathering date. It noted that the jet restriction might be permissible under Grant Assurance 22(i), but it concluded it couldn't know that for sure until it coordinated with FAA's Air Traffic Organization to assess whether the restriction was "necessary for airspace safety" or efficiency.

After conducting that assessment, the Airports Division issued a finalized Part 13 report in March 2017. That report concluded that allowing jets on one of Lantana Airport's runways

---

[4] A specialist in the FAA's Orlando Airports District Office also concluded: "It does not appear that the FAA has ever analyzed this restriction."

would "not affect safety or efficiency" but that the County could "continue to restrict jet operations" on the other two runways because they "could potentially impact air traffic efficiency at Palm Beach International." The Airports Division noted, however, that its "conclusions [did] not obligate the County to alter its existing plans for" Lantana Airport because other features of the potentially usable runway may justify the County "continu[ing] to reasonably restrict" its use.

## B. Part 16 Proceedings

Despite the Airports Division's conclusions, the County did not change the Lantana Airport's jet restriction. So Forman filed a formal Part 16 complaint in August 2017, again alleging that the jet restriction violated Grant Assurance 22(a). He noted that the restriction was being applied to all jets and not just to pure turbojets as it was written. He argued that it wasn't grandfathered under ANCA. He reiterated that the County hadn't done the required analyses to show the noise-based restriction was reasonable, either when it was first enacted or since then. And he asserted that compliance with ANCA "does not immunize an airport sponsor from liability for violating" a grant assurance.

The County filed a motion to dismiss Forman's Part 16 complaint. As a preliminary matter, the County contended that a Part 16 proceeding wasn't the appropriate vehicle for addressing ANCA issues and that the Director of the FAA Office of Airport Compliance and Management Analysis (the official deciding Forman's Part 16 complaint) should "assume without deciding, for

the purpose of [the Part 16] proceeding, that the restriction is grandfathered under ANCA."

The County alternatively argued that, if the Director chose to consider whether the jet restriction was grandfathered instead of just assuming that it was, the restriction was grandfathered. The County argued that ANCA doesn't require restrictions to be codified and that the County had continually enforced the jet restriction in exactly the same way since 1973, regardless of whether the text of the 1973 regulation had been repealed or narrowed. According to the County, that meant the restriction was "in effect" before October or November 1990, which meant the restriction was grandfathered and ANCA's requirements did not apply to it.

And the County argued that Forman hadn't justified revisiting what it considered to be the FAA's repeated findings that the restriction was "reasonable, in conformance with the County's grant assurance obligations, and enforceable." The County asserted it would be "inappropriate" for the FAA to make the County rescind the jet restriction "without first comprehensively and formally analyzing whether" the restriction "*continues* to be justified for noise, safety and/or efficiency reasons" and "what the actual impact of rescinding or modifying the restriction would be."

### 1. The Director's Determination

The Director agreed with Forman and denied the County's motion to dismiss. On the preliminary matter of whether he could address ANCA issues in a Part 16 proceeding, the Director found that the case "ultimately involve[d] an alleged violation of the grant assurances." And "where the allegations regarding violations of the assurances are intertwined with issues related to ANCA, the Director is certainly authorized to examine or take notice of" whether the restriction complied with ANCA, including whether it was grandfathered. That's because the Director "needs to understand the status of the questioned noise and access restriction under ANCA" to "reach a ruling on the grant assurances." So ANCA being "raised as a related or ancillary issue or defense does not divest the Agency of jurisdiction." The Director also noted that Grant Assurance 1(a) required the County to comply with ANCA, but he didn't explicitly anchor his authority to that provision.[5]

On the merits, the Director found that the jet restriction was not grandfathered under ANCA because the "plain language" of the 1988 ordinance clearly repealed the 1973 regulation and the reintroduction of the restriction in the 1991 interlocal agreement occurred after the ANCA grandfathering deadline. He also found

---

[5] As a second preliminary matter, the Director addressed who had the burden of proof, concluded Forman did, and determined Forman had "stated a valid *prima facie* case."

that the County wasn't in compliance with Grant Assurance 22. Citing the Second Circuit's *East Hampton* decision, the Director concluded that noise and access restrictions that don't comply with ANCA and aren't grandfathered are a "violation *per se* of Grant Assurance 22" because actions that violate legal mandates like ANCA "are, by their nature, unreasonable and arbitrary."

Further analyzing the jet restriction, the Director explained that it "lacked justification and support" because the County had not defended the necessity of the restriction with "specifically identified and documented noise, safety, and efficiency concerns." Instead the County simply argued that the restriction had been in effect since 1973 and, as a result, "should be allowed to stand without providing evidence that a noise problem exists." But the Director rejected the County's reliance on what it considered the FAA's implicit approval of the restriction because the FAA had never before been "formally asked to provide an analysis" of the restriction and the FAA's informal determinations related to the restriction did not consider the impact of the 1988 ordinance on the restriction's continued validity.

Finally, the Director concluded that the jet restriction was "unjustly discriminatory because it allows aircraft equally noisy or noisier than the aircraft" it restricts. And he noted that the County's enforcement of the restriction was even more discriminatory than the written restriction itself indicated because the County actually excluded all jets — including Forman's turbofan — not just pure turbojets. The Director ordered the County to

submit a Corrective Action Plan revoking the restriction and to publicize that revocation, though he did agree with the County that its Plan could take a "measured approach."

### 2. The Final Agency Decision of the Associate Administrator

The County appealed the Director's Determination to the Associate Administrator, who affirmed it but modified and expanded the Corrective Action Plan. First, the Associate Administrator rejected the County's argument that the Director had exceeded the FAA's authority by considering ANCA in a Part 16 proceeding. He noted that the Director hadn't based his jurisdiction on ANCA but instead on the "grant assurance issue" and concluded that "the grandfathering inquiry was integral to reach that issue." The Associate Administrator also agreed with the Director that nothing in Part 16 of the regulation bars considering ANCA in Part 16 proceedings, particularly in light of the Second Circuit's *East Hampton* decision. He distinguished the FAA's *Aircraft Owners* decision, which had declined to consider ANCA in a Part 16 proceeding.

The Associate Administrator rejected the County's argument that the restriction was grandfathered because it was "in effect" in 1990. He noted that the County had provided "no authority" for its position that its past practices should determine whether the restriction remained in effect, and he concluded that the definition of "effect" supported the Director's view that the existence of a law was the relevant factor. The Associate Administrator noted that it appeared the County's own practice was "to

21-10771                Opinion of the Court                21

tie the existence of a restriction to a formal enactment," and he reasoned that "ANCA itself" supported his conclusion that grandfather rights apply only to formally documented restrictions instead of to mere practices. As he viewed it, ANCA tied both grandfather rights and similar rights to the existence of formal legal documents. There was, he added, "no support for the County's approach of establishing grandfather rights . . . based on an alleged practice untethered from law and in contradiction to record evidence."

As to the FAA's earlier dealings with the Lantana Airport jet restriction, the Associate Administrator found that the Director had appropriately "determined whether prior FAA actions were formal or informal and whether they were based on a complete record." He pointed out that previous FAA letters discussing the restriction had no "explanation or supporting analysis" about why or how the restriction "was reasonable and not unjustly discriminatory." Those FAA letters did not discuss the "key legal development" of the 1988 repeal. As a result, their conclusions had been "based on incomplete facts," and the Director had properly given them "limited weight." The Associate Administrator also reasoned that because a 2001 informal complaint about the Lantana Airport jet restriction "did not result in an FAA determination," it was "not analogous to 'FAA approval.'" So he concluded that none of the earlier FAA examinations of the jet restriction showed it was grandfathered.

Finally, the Associate Administrator found the Director had correctly concluded that the jet restriction violated Grant Assurance 22. To "address the County's argument that the Director did not provide evidence to substantiate his findings or truly analyze the facts of the case," the Associate Administrator reexamined "all of the relevant elements" in the restriction, including "jet noise," "aircraft weight," "cargo operations," "safety and efficiency," and environmental impact.

On jet noise, the Associate Administrator found no justification for the restriction because the County had "no substantive data" — like noise studies or documentation — from 1973 or since to prove that there was a noise problem or that the restriction was the least restrictive solution to it. Instead, the FAA's own objective data on aircraft noise showed that many of the aircraft Lantana Airport allows are noisier than jets and that they have been noisier before and since 1973, making the restriction "flawed the day it was adopted."

Objective data similarly refuted the need for the restriction based on weight because there was no link between weight and noise: many aircraft weighing less than 12,500 pounds are noisier than aircraft weighing more than that. And while the County argued heavier aircraft do more damage to the airport's pavement, objective data showed that was not true. Nor was there any reason to prohibit cargo planes at Lantana Airport because "[w]hat an aircraft carries, people or cargo, or what operation it performs, is unrelated to noise, weight, safety, or any other justification."

After noting "the evidence strongly suggests that the real reason for these restrictions is noise mitigation and not safety and efficiency," the Associate Administrator found no safety or efficiency justification existed anyway. He explained that the "FAA, not the County, is the final authority" about safety and efficiency and that the FAA Flight Standards Office had no objection to turbojet operations at the Lantana Airport, as its analysis in Forman's Part 13 proceeding showed. Because "Flight Standards is the ultimate expert arbiter" and "provides the definitive position on aviation safety," the Director had appropriately relied on its finding. As a result, the Associate Administrator agreed with "the overall conclusion" that the airport "can safely and efficiently accommodate jets."

But the Associate Administrator disagreed with the Airports Division's Part 13 conclusion that the jet restriction could continue to apply to two of Lantana Airport's three runways. He explained that the concern of the Flight Standards Office about those two runways related to airspace impacts at Palm Beach International Airport, which wasn't a safety issue and could be accommodated with flight pattern modifications. As for environmental impacts, the Associate Administrator noted that Part 16 proceedings don't require statutory evaluations but that the FAA may later have to perform one if the County's Corrective Action Plan triggers that obligation.

Because the jet restriction wasn't justified for any of the reasons the County asserted, the Associate Administrator found it

was unreasonable and unjustly discriminatory.  He acknowledged the County's request that the FAA study the "impacts of rescinding the restriction" before requiring rescission, but he found the need for a study itself "illustrates the lack of justification for the restriction in the first place."  The Associate Administrator concluded that the Director hadn't erred in finding the County violated Grant Assurance 22 or in ordering a Corrective Action Plan requiring the County to rescind the restriction.

The Associate Administrator did, however, modify the Plan's timeline.  Because the County had not corrected or rescinded the restriction despite having multiple opportunities to do so, he declined to delay the recission any longer and ordered the County to provide "instant relief in the form of reasonable airport access" during its "phased-in approach" to the rest of the Plan. The Associate Administrator also ordered the FAA not to approve any of the County's grant applications until it approved the County's steps under the Plan and to "consider appropriate action regarding the County's noncompliance with ANCA."

## IV. Discussion

The County makes three arguments in its petition for review of the Associate Administrator's Final Administrative Decision.  Two concern ANCA, and one concerns Grant Assurance 22.

### A. The ANCA Issues

As it has throughout the administrative proceedings, the County continues to contend that the FAA exceeded its authority

under Part 16 by considering ANCA issues when analyzing For-man's complaint. It also contends the Associate Administrator's conclusion that Lantana Airport's jet restriction wasn't grandfa-thered under ANCA was arbitrary, capricious, unsupported by substantial evidence, and not in accordance with the law.

### 1. Part 16 Authority

The County contends that the FAA was wrong to analyze ANCA in Forman's Part 16 proceeding because the Act has its own separate enforcement process: a Part 161 proceeding. *See supra* at 5; *infra* at 26–27. The County asserts that, by considering ANCA in a Part 16 proceeding, the agency failed to follow its own regu-lations and precedent. The FAA responds that it has the authority to enforce grant assurances in a Part 16 proceeding and that, be-cause noncompliance with a federal law like ANCA can make a restriction unreasonable, it needed to analyze ANCA to enforce the grant assurances as it did here. The FAA notes that Part 16 doesn't specify how it must evaluate grant compliance, nor does Part 16 prohibit it from taking into account violations of other fed-eral laws when determining whether a restriction is unreasonable or unjustly discriminatory.

To determine whether the FAA may consider ANCA issues in a Part 16 proceeding or instead must use a Part 161 proceeding for that, we interpret the regulations that govern those proce-dures. "When we construe regulations, we begin with the lan-guage of the regulation, just as we do for statutes." *Landau v. RoundPoint Mortg. Servicing Corp.*, 925 F.3d 1365, 1369 (11th Cir.

2019).  If we find the Part 16 and Part 161 regulations to be "genuinely ambiguous," we will defer to the FAA's interpretation of them if it is both "reasonable" and "worthy of controlling weight." *See Rafferty v. Denny's, Inc.*, 13 F.4th 1166, 1179 (11th Cir. 2021) (quoting *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415–16 (2019)).  Of course, if we find those regulations to be unambiguous, we needn't and won't defer to the FAA's view.  *See Kisor*, 139 S. Ct. at 2415 ("[I]f the law gives an answer — if there is only one reasonable construction of a regulation — then a court has no business deferring to any other reading, no matter how much the agency insists it would make more sense.").

It's true that the FAA can and sometimes does enforce ANCA through Part 161 proceedings.  Part 161 regulations set out the conditions new noise restrictions must meet to be permitted under ANCA and the process new noise restrictions must satisfy before they can be approved under the Act.  *See* 14 C.F.R. §§ 161.1 to .417.  Part 161 regulations also make clear the procedures used when an airport sponsor appears to be in violation of ANCA, as well as the penalties that apply when a sponsor violates it.  *See id.* § 161.501 (noting that the FAA can "terminate eligibility for airport grant funds and [has] authority to impose or collect passenger facility charges for an airport operator's failure to comply with" ANCA); *id.* §§ 161.503 to .505.  But while Part 161 is the only way to get a new noise restriction approved under ANCA or to invoke the specific penalties available for ANCA violations, nothing in

Part 13, Part 16, or Part 161 suggests that Part 161 proceedings are the only ones in which the FAA can consider ANCA compliance.

Not only that, but Part 16 regulations explicitly permit the FAA to evaluate potential violations of the 49 U.S.C. § 47107 grant assurances in Part 16 proceedings. *See* 14 C.F.R. § 16.1(a)(5). And Grant Assurance 1(a) explicitly requires airport sponsors to comply with ANCA. *See Airport Sponsor Assurances* at 2 ("The sponsor hereby assures and certifies, with respect to this grant that . . . [i]t will comply with . . . Title 49, U.S.C., subtitle VII, as amended."); *Friends of E. Hampton Airport*, 841 F.3d at 138 ("Subtitle VII (referenced in Grant Assurance 1(a), at Part B, Chapter 475, Subchapter II) encompasses the Airport Noise and Capacity Act of 1990 ('ANCA')."). A proper evaluation of an airport sponsor's compliance with grant assurances not only *allows* the FAA to consider ANCA issues that are intertwined with or relevant to grant assurance issues, it likely *requires* that consideration.

That's so even though Forman didn't specifically identify Grant Assurance 1(a) as a basis for his complaint. The pleading rules for a Part 16 proceeding don't require a complainant to identify the specific grant assurance (or assurances) potentially being violated; they require only a description of how the complainant was "directly and substantially affected by the things done or omitted to be done by the respondents." *See, e.g.*, 14 C.F.R. § 16.23. Once the description in Forman's complaint revealed that the jet restriction may not be compliant with ANCA, which would mean the County was not compliant with Grant Assurance 1(a), the FAA

was correct to evaluate that potential noncompliance. ANCA compliance is a component of grant assurance compliance, and Part 16 proceedings are the correct vehicle for the FAA to evaluate grant assurance compliance. Though the FAA did not explicitly anchor its authority to consider ANCA issues in Forman's Part 16 proceeding on Grant Assurance 1(a), it recognized that specific grant assurance could support consideration of the ANCA issues in this proceeding. It was correct.

The FAA was also correct that it had to consider the potential ANCA issues in order to assess the County's alleged violation of Grant Assurance 22. That's because Grant Assurance 22(a) requires airport sponsors to "make the airport available as an airport for public use on *reasonable* terms," while Grant Assurance 22(h) requires any restrictions on the airport's use to be "*reasonable.*" *See Airport Sponsor Assurances* at 10–11 (emphases added). And "actions taken in violation of legal mandates" like ANCA "are, by their nature, *unreasonable.*" *Friends of E. Hampton Airport*, 841 F.3d at 153 (emphasis added). So before the FAA could decide whether Lantana Airport's jet restriction was reasonable or unreasonable — and, as a result, compliant or noncompliant with Grant Assurance 22 — it had to decide both whether the restriction was within or grandfathered outside the scope of ANCA and, if within ANCA's scope, whether it violated that law. That is exactly what the FAA did.

Our conclusion about the FAA's authority might be different if the goal of Forman's Part 16 proceeding had been to subject

the County to the specific penalties available for violating ANCA. But Forman didn't ask that the County's federal airport grants be terminated; he asked only that Lantana Airport be required to "allow[] turbofan jets" like his Cessna to use the airport. Similarly, we might agree with the County if the FAA had assessed ANCA-specific penalties in its Final Agency Decision, but that's not what happened.

While the Associate Administrator found in the Final Agency Decision that the jet restriction is "not grandfathered under ANCA," he did not order termination of the County's grants. Instead, he ordered that approval of the County's grant applications "be withheld" until the County complies with the Corrective Action Plan. Withholding approval of a grant application is different from terminating a previously approved grant. The Associate Administrator also specifically directed the FAA to "consider appropriate action regarding the County's noncompliance with ANCA." That "appropriate action" must be an ANCA-specific Part 161 proceeding where the FAA would be authorized to assess ANCA-specific penalties, which means the Final Agency Decision did not address the County's ANCA violation outside of how it impacted the County's compliance with the grant assurances. Instead, the Final Agency Decision analyzed and decided ANCA issues that were bound up in its decision about whether the County violated a grant assurance, which it had the authority to do in a Part 16 proceeding.

We need not address any question about the deference we might owe the FAA's interpretation of the Part 16 and Part 161 regulations because in our view those regulations make clear that the FAA's interpretation is correct even without any deference. *See Kisor*, 139 S. Ct. at 2415. ANCA issues are properly considered in a Part 16 proceeding. The FAA had authority to consider ANCA issues as a component of its analysis of the County's compliance with its grant assurances.

## 2. Grandfathering

The County contends the Associate Administrator's determination that Lantana Airport's jet restriction was not grandfathered under ANCA was arbitrary, capricious, unsupported by substantial evidence, and not in accordance with the law. It argues the jet restriction has been continuously "in effect" since 1973, either because: (1) the 1988 ordinance didn't repeal the restriction or (2) even if it did, the restriction's "formal codification status is irrelevant" and the County's consistent enforcement of it is all that matters. The FAA replies that the 1988 ordinance did repeal the jet restriction and that ANCA's text shows "the grandfather clause does not apply to informal county practices implemented over a legislative repeal" because ANCA elsewhere requires formal and operative documents when using the phrase "in effect."

As we have noted, ANCA doesn't apply to restrictions that were in effect before October or November 1990. *See* 49 U.S.C. § 47524(c)(1) (making ANCA applicable to "airport noise or access restriction[s] on the operation of stage 3 aircraft not in effect on

October 1, 1990"); *id.* § 47524(d) (requiring a small subset of air-port noise or access restrictions to be "in effect on November 5, 1990" instead); *Airport Compliance Manual* § 13.14(b).  So if the 1973 jet restriction has in fact been in continuous effect for 49 years, as the County argues, it would be grandfathered under ANCA.  If there was a break in the restriction's effectiveness, how-ever — for example, if it was repealed and then reenacted after the effective date of ANCA in 1990 — the restriction would not enjoy grandfather protection.

With that in mind, we address the County's first argument, which is that the 1988 ordinance didn't repeal the 1973 regulation establishing the jet restriction.  It's easy to address.  The 1988 or-dinance explicitly states that it "supercedes (sic) and repeals all air-port regulations adopted on or before October 27, 1987."  The 1973 jet restriction, which was adopted by the Board to regulate noise at Lantana Airport, is certainly an airport regulation.  And it was certainly adopted by the County before October 1987. So it was certainly within the group of regulations the 1988 ordinance repealed.

The 1988 ordinance's repealer language is clear: it "super-cedes (sic) and repeals all airport regulations adopted on or before October 27, 1987."  Yet, the County argues that the Board "had no intention to repeal the jet restriction" and that Florida law requires us to subordinate the ordinance's clear language to the Board's "evident legislative intent."  But to "discern legislative intent," Florida courts look "first to the plain and obvious meaning of the

[law]'s text." *W. Fla. Reg'l Med. Ctr., Inc. v. See*, 79 So. 3d 1, 9 (Fla. 2012). "If that language is clear and unambiguous and conveys a clear and definite meaning," they "will apply that unequivocal meaning and not resort to the rules of statutory interpretation and construction." *Id.* The language of the 1988 ordinance could scarcely be any clearer or more unambiguous or more definite. It expressly repealed "all airport regulations adopted on or before October 27, 1987," and it put a comprehensive new airport regulatory scheme in their place.

We have no doubt that the 1973 jet restriction regulation was repealed when the 1988 ordinance said it was. But if we had any doubt, the 1998 resolution would dispel it. Like the 1988 ordinance did with all airport regulations adopted before October 1987, the 1998 resolution explicitly "supersedes and repeals all Airport Rules and Regulations adopted before" February 24, 1998. The 1998 resolution's repeal included the "Rules and Regulations, as adopted by prior Resolutions and codified in the Code of Laws and Ordinances relating to Palm Beach County Government at Appendix B." Appendix B is where the 1988 ordinance's comprehensive framework of airport regulations had been codified. Which means that the 1998 resolution repealed the entire airport regulatory scheme that had been enacted by the 1988 ordinance.

The 1998 resolution put into effect a new set of Rules and Regulations for airports, which remain in effect today. *See* Palm Beach Cnty., Fla., Code of Laws & Ordinances app. B (2022). Those Rules and Regulations include four sections specific to

Lantana Airport. *Id.* at §§ 12-3 to 12-7. One of those sections, under the heading "Use Restrictions," is the jet restriction: "Pure turbo-jet aircraft and aircraft in excess of 12,500 pounds engaging in air cargo operations are prohibited." *Id.* at § 12-6(a). The jet restriction created by the 1998 Rules and Regulations was a new noise restriction, both legislatively and linguistically. *Compare id.*, *with* Suppl. App. at 244 (noting that the 1973 regulation, as amended in November 1973, read: "All jet aircraft prohibited and all aircraft weighing in excess of 12,500 pounds engaged in aircraft cargo operations prohibited"). And noise restrictions enacted after ANCA's 1990 effective date do not get grandfather protection. *See* 49 U.S.C. § 47524(c), (d).

That brings us to the County's second argument, which is that the 1973 jet restriction was (and is) still "in effect" for ANCA purposes, despite being explicitly repealed, because its "formal codification status is irrelevant." The County not only admits but insists that for nearly fifty years its practice has been "to enforce the restriction exactly as originally enacted in 1973," as a "ban on *all* jet aircraft." Which means that for the 34 years since the restriction was repealed by the 1988 ordinance, the County has ignored that repeal. And the County argues that doing so has earned it the right to continue to do so. We have seldom, if ever, encountered any other party who has argued that because it has not followed the law for years, it should not be required to do so now.

There's an obvious reason for the rarity of that argument. It violates a core principle of our government by ignoring the

critical separation of powers rule that it is the executive branch's job to enforce laws, not to create (or amend) them. *See, e.g.*, *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015) (noting that it is "the Legislative Branch, not the Executive Branch, that makes the law"); *Ohio v. Johnson*, 467 U.S. 493, 499 (1984) ("[T]he substantive power to prescribe crimes and determine punishments is vested with the legislature."); *United States v. Wiltberger*, 18 U.S. 76, 96 (1820) (noting that it "would be dangerous" for a court to treat "a case which is within the reason or mischief of a statute" as being actually "within its provisions, so far as to punish a crime not enumerated in the statute").

But even if we didn't comment on the audacity of the County's argument, we do not agree with it. ANCA itself requires more than enforcement without an enacted law for a restriction to be "in effect." Those are the key words in ANCA. *See* 49 U.S.C. § 47524(c)(1) (making ANCA applicable to "airport noise or access restriction[s] on the operation of stage 3 aircraft not *in effect* on October 1, 1990") (emphasis added); *id.* § 47524(d) (requiring a small subset of airport noise or access restrictions to be "*in effect* on November 5, 1990" instead) (emphasis added). We turn now to the Act and its regulations for guidance about the meaning of "in effect."

"The construction of a statute by an agency charged with its administration is entitled to substantial deference from the reviewing court." *City of Pompano Beach v. FAA*, 774 F.2d 1529, 1540 (11th Cir. 1985) (quotation marks omitted). We "must

respect the agency's findings and conclusions when the question involves an interpretation of a statute that is within the agency's specialized knowledge and expertise," and we "will adhere to the principle that the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong." *Id.* (cleaned up). Of course, the agency's "interpretation of the governing statute, application of that statute to the facts, and conclusion must . . . be reasonable." *Id.* And of course, "if we determine — employing traditional tools of statutory construction — that Congress has spoken clearly, we do not defer to the agency's interpretation of the statute, because we must give effect to the unambiguously expressed intent of Congress." *Barton v. U.S. Att'y Gen.*, 904 F.3d 1294, 1298 (11th Cir. 2018) (cleaned up).

Although ANCA does use the phrase "in effect," the provisions containing it don't define what the phrase means. *See* 49 U.S.C. § 47524(c)–(d). Neither does ANCA's definition section, *see id.* § 47522, or the statute's implementing regulations, *see* 14 C.F.R. § 161.5. But of some potential help, the regulations do define "Noise or access restrictions":

> Noise or access restrictions means restrictions (*including but not limited to provisions of ordinances and leases*) affecting access or noise that affect the operations of Stage 2 or Stage 3 aircraft, such as . . . a limit, direct or indirect, on the total number of Stage 2 or Stage 3 aircraft operations; . . . and any other limit

on Stage 2 or Stage 3 aircraft that has the effect of con-
trolling airport noise. . . .

*Id.* (emphasis added).

The County asserts the "but not limited to" language shows that not all restrictions have to be laws. That's true, as even the listed examples show: a lease is not a law. But just because ANCA doesn't require a restriction to be a law doesn't mean it allows a restriction to be completely unwritten.

To agree with the County's position, though, that's what we'd have to find, because the jet restriction has been continuously in effect only if we focus on the County's asserted unwritten practice of continuously enforcing it. We'd have to ignore both the critical gap between 1988 and 1991 when there was no written restriction and the language of the current restriction, which bans only "pure turbo-jet aircraft" and not all jets as the 1973 restriction did. There are plenty of practical reasons that just can't be the correct interpretation of ANCA, including notice problems and the potential for abuse: how can pilots avoid being sanctioned for violating, and how can we be sure airport operators aren't selectively enforcing, a restriction that isn't written and publicly available?

Beyond practical considerations, ANCA's implementing regulations support a conclusion that restrictions must be written. First, the explicit examples in the definition of noise and access restrictions are, as we noted above, "provisions of ordinances and leases." 14 C.F.R. § 161.5. Both of those are written documents.

And second, as part of the approval process for new restrictions under ANCA, the regulations require that proponents of new restrictions provide:

> A clear, concise description of the proposed restriction (and any alternatives, in order of preference), including a statement that it will be a mandatory Stage 3 restriction; and where *the complete text of the restriction*, and any sanctions for noncompliance, *are available for public inspection*; . . . [and] [t]he proposed effective date of the restriction, the proposed method of implementation (e.g., *city ordinance, airport rule, lease, or other document*), and any proposed enforcement mechanism. . . .

*Id.* § 161.303(c)(2), (5) (emphasis added); *see also, e.g., id.* § 161.305(a) (requiring the "*complete text of the proposed restriction* and any submitted alternatives, including *the proposed wording in a city ordinance, airport rule, lease, or other document*, and any sanctions for noncompliance") (emphasis added). As those regulatory references show, a new noise restriction will not be ANCA-compliant (and therefore can't be approved) unless it is written — unless it has "text" that the public can inspect and unless it is implemented by a "document" containing its wording.

A grandfathered restriction doesn't have to comply with ANCA or its regulations, of course. And the statutory and regulatory provisions that set out the grandfather exception don't contain any requirements other than that the "restriction" be "in effect" before the cutoff date. *See* 49 U.S.C. § 47524(c)–(d); 14 C.F.R.

§ 161.7(d)(1)–(2).  But it is a common tool of statutory construction to consider what words or phrases mean in nearby statute sections or related regulations.  *See Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1192 (11th Cir. 2019) ("The whole-text canon refers to the principle that a judicial interpreter should consider the entire text, in view of its structure and of the physical and logical relation of its many parts, when interpreting any particular part of the text. Properly applied, it typically establishes that only one of the possible meanings that a word or phrase can bear is compatible with use of the same word or phrase elsewhere in the statute. Closely related to the whole-text canon is the principle that a word or phrase is presumed to bear the same meaning throughout a text unless context requires otherwise.") (cleaned up); *Cremeens v. City of Montgomery*, 602 F.3d 1224, 1227 (11th Cir. 2010) ("We apply the canons of construction to regulations as well as to statutes.").

So we should look at all of ANCA's implementing regulations to understand what the grandfather provisions mean when they say "restriction" and "in effect."  What those regulations demonstrate is that a restriction is in effect when, at minimum, its complete text is written in a document that is available for public inspection and its effective date has passed.  *See* 14 C.F.R. §§ 161.303(c), 161.305(a).  We think ANCA and its implementing regulations have "spoken clearly" that a restriction must be written to be in effect.  *See Barton*, 904 F.3d at 1298.  But even if there were any ambiguity on the point, we would still find the

FAA's identical conclusion reasonable and defer to it.  *See City of Pompano Beach*, 774 F.2d at 1540.

Because restrictions must be written to be "in effect," the County's reliance on its practice of enforcing a restriction that at times did not exist — and of enforcing the currently existing restriction in a way that bans more jets than its words justify — does not prove that Lantana Airport's jet restriction has been continuously in effect since 1973.  The gap in the restriction's effectiveness between 1988 (when the 1973 regulation was repealed by the 1988 ordinance) and at least 1991 (when the County entered the interlocal governmental agreement with Atlantis, which was a written document available to the public that contained a version of the jet restriction) means the restriction isn't grandfathered under ANCA.

### B. Grant Assurance 22

Finally, the County contends the Associate Administrator's conclusion that the County violated Grant Assurance 22 was arbitrary, capricious, and unsupported by substantial evidence.  It argues that in concluding a violation occurred, the Associate Administrator improperly: shifted to the County Forman's burden to show that the restriction was justified for safety and efficiency reasons; did not investigate whether the restriction was justified for safety and efficiency; and did not give a "reasoned explanation for

abandoning" the FAA's earlier finding that the jet restriction was justified for noise, safety, and efficiency.

The FAA responds that the restriction violates Grant Assurance 22 because denying airport services in a way that violates a federal law (ANCA) cannot be "reasonable" or "just." It argues that who had the burden is "immaterial" because the overwhelming evidence shows the restriction wasn't "justified by noise, safety, or any other concern." And the FAA asserts that its previous statements did not constitute a definitive agency position because they were "informal or non-final" and, in any event, the agency explained any "change" in position by acknowledging its previous lack of analysis and its recent discovery of the 1988 repeal.

"We will uphold the agency's decision unless it is arbitrary and capricious, an abuse of discretion, or otherwise contrary to law." *Aerial Banners, Inc. v. FAA*, 547 F.3d 1257, 1260 (11th Cir. 2008) (citing 5 U.S.C. § 706). We "do not substitute our own judgment for the agency's about what action is warranted" and "will set aside the FAA's order on substantive grounds only if the agency relied on improper factors, failed to consider important relevant factors, . . . committed a clear error of judgment that lacks a rational connection between the facts found and the choice made," or "fail[ed] to follow its own regulations and procedures." *Id.* (cleaned up). It did none of those things.

As we have explained, Grant Assurance 22(a) requires airport sponsors to make the airport available "for public use on

reasonable terms and without unjust discrimination." *Airport Sponsor Assurances* at 10. If sponsors want to establish any restrictions on an airport's use, Grant Assurance 22(h) and 22(i) require those restrictions to be "reasonable," "not unjustly discriminatory," and "necessary for the safe and efficient operation of the airport." *Id.* at 10–11. And ANCA requires that new restrictions meet certain "notice, review, and approval requirements." 14 C.F.R. § 161.3(c); *see also* 49 U.S.C. § 47524; 14 C.F.R. §§ 161.1 to .505.

Whether the current Lantana Airport jet restriction was enacted in 1991 by the interlocal governmental agreement with Atlantis, in 1992 by the County Director of Airports' directive, or in 1998 by the Rules and Regulations, it was enacted after the two 1990 effective dates of ANCA. *See* 49 U.S.C. § 47524(c)(1) (making ANCA applicable to "airport noise or access restriction[s] on the operation of stage 3 aircraft not in effect on October 1, 1990"); *id.* § 47524(d) (requiring a small subset of airport noise or access restrictions to be "in effect on November 5, 1990" instead). Because the restriction was enacted after ANCA applied and was not grandfathered, *see supra* at 30–39, it had to comply with ANCA's substantive and procedural regulations. It did not. We agree with the Second Circuit that "actions taken in violation of legal mandates are, by their nature, unreasonable." *Friends of E. Hampton Airport*, 841 F.3d at 153 (considering ANCA in the context of the proprietor exception, which requires restrictions to be "reasonable, nonarbitrary, and nondiscriminatory") (quotation marks

omitted).  So the ANCA violation is alone enough to sustain the Associate Administrator's conclusion that the County violated Grant Assurance 22(a).

But the Associate Administrator's thorough Final Agency Decision goes beyond that violation to explain why none of the other possible justifications for the Lantana Airport jet restriction have merit.  The Associate Administrator concluded that the restriction wasn't justified by "jet noise," "aircraft weight," "cargo operations," "safety and efficiency," or environmental impacts. His explanations of why those considerations don't justify the jet restriction rely on studies that the FAA's subject-matter expert departments conducted during Forman's earlier Part 13 proceedings and also on various general FAA data reports about aircraft noise, weight, and speed specifications.  The Associate Administrator's conclusions were supported by substantial evidence and were not arbitrary and capricious. *See* 49 U.S.C. § 46110(c); *Aerial Banners, Inc.*, 547 F.3d at 1260.

Although we agree with the County that Forman had the burden to show noncompliance, 14 C.F.R. § 16.23(k), we agree with the FAA that Forman met his burden by demonstrating that the jet restriction made Lantana Airport unavailable for his public use for a noise-based reason that did not comply with (and was not grandfathered under) ANCA.  On the other hand, the County had the burden to prove its motion to dismiss, which was based in part on its assertion that the jet restriction did not violate Grant Assurance 22, and its affirmative defenses, which included showing that

"the restriction is . . . justified . . . to ensure the safety and efficiency of" Lantana Airport "and the larger Airport System." *Id.* Despite bearing the burden on those issues, the County offered no data or studies to support its position that the jet restriction was ever justified based on safety and efficiency.

When the County accepted grant money for the Lantana Airport, which it did at least as recently as 2012, it agreed to the grant assurances. Under Grant Assurances 22(h) and 22(i), it was allowed to prohibit jets and heavy aircraft from using Lantana Airport only if that restriction was necessary for safety or efficiency. Without data or studies to show how it determined the restriction was necessary for those reasons, there was nothing in the record to counterbalance Forman's and the FAA's evidence that the restrictions aren't justified by noise, safety, efficiency, or other concerns. Instead, all the actual, objective, data-driven evidence in the record shows that the restrictions aren't necessary for safety or efficiency. When we combine that finding with Grant Assurance 22(a)'s requirement that an operator otherwise must "make the airport available," it's clear that the County's jet restriction is a Grant Assurance 22 violation. The Final Agency Decision got it right.

Finally, as to the County's argument that it has relied for nearly fifty years on the FAA's "prior determinations" that the jet restriction was justified, the Associate Administrator gave a reasoned explanation for any "change" in the FAA's position: it had

never before rigorously analyzed the restriction, explained that analysis, or understood the impact of the 1988 repeal.

Regardless, the jet restriction could not continue unchanged once the Associate Administrator concluded it wasn't necessary. The FAA has exclusive authority over our national navigable airspace, 49 U.S.C. § 40103(a)(1), which means it's responsible for "develop[ing] plans and policy . . . necessary to ensure the safety of aircraft and the efficient use" of that space, *see id.* § 40103(b)(1). It "may modify or revoke an assignment [of airspace] when required in the public interest." *Id.* So it certainly can decide whether an airport use restriction should be revoked. As long as any change in the FAA's position on an airport restriction isn't based on an impermissible ground like bias, it has the authority to make that change. As it should, because our national air safety depends on it.

The Associate Administrator's conclusion that Lantana Airport's jet restriction violates Grant Assurance 22 wasn't arbitrary and capricious but instead was supported by substantial evidence. 49 U.S.C. § 46110(c); *Aerial Banners, Inc.*, 547 F.3d at 1260. The Associate Administrator considered "important relevant factors" and demonstrated a "rational connection between the facts found and the choice made." *Aerial Banners, Inc.*, 547 F.3d at 1260 (quotation marks omitted). And "the record reveals relevant evidence that a reasonable mind might accept as adequate to support [the] conclusion." *City of Pompano Beach*, 774 F.2d at 1539–40 (alteration adopted and quotation marks omitted).

## V.  Denial of the Petition for Review

For the reasons discussed, on this record we DENY the County's petition for review.